BREYFOGLE et al. v. WALSH et al.

(Circuit Court, N. D. Illinois. December 17, 1894.)

INJUNCTION—INEQUITABLE CONTRACT—BANKS AND BANKING—CORPORATIONS.

A bill which seeks to restrain the sale by a bank of property pledged as collateral security to a note discounted by it, on the ground that the president of the bank secretly agreed that he would see to the payment

of the note without sale of the collateral, does not state a case for equitable relief, since such agreement, being against the interest of the bank, should not be enforced for the benefit of a party to it.

In Equity.

Suit by William L. Breyfogle and others against John R. Walsh, the Equitable Trust Company, and others. Complainant moves for a temporary injunction.

Duncan & Gilbert, for complainants.
Green, Robbins & Honore, for defendants.

GROSSCUP, District Judge. This is a bill for an injunction. The pleadings are so voluminous, and go into the transactions under review with so much detail, that no attempt, in this opinion, will be made to follow them. The gravamen of the complaint, and the propositions on which it turns, are susceptible of a briefer statement. The complainant Breyfogle, with others, was interested, as owner, in 1892, of extensive stone quarries, near Bedford, Ind.; the ownership being represented by a corporation under the laws of that state, which had issued bonds and stock to the amount of $500,000 each, the bonds being secured by mortgage upon the property. The bonds and mortgage ran to the Jennings Trust Company of Chicago, and, having come into the hands of the parties interested, were used by them in various financial transactions, and especially in taking up conflicting or rival interests. The defendant John R. Walsh was, at the time, president of the Jennings Trust Company and the Chicago National Bank, when, the complainants aver, he became so interested in the quarries venture that, in 1892, he joined with the complainant Breyfogle in a scheme to build a belt road, whereby there would be furnished to the quarries an outlet for their products. This scheme involved the outlay of from two hundred and fifty to three hundred thousand dollars, the money for which was procured by the issuance of bonds upon the belt railway line to the amount of two hundred and fifty thousand dollars. The complainants aver that, before or at the time of the initiation of this railway scheme, an understanding was arrived at between themselves and Walsh, by the terms of which Walsh was to procure the advances of money needed to construct and develop the proposed properties, including both the railway and the quarries, for which he was to have, as an individual, a share in the profits of the venture. During the following year, the financial affairs and needs of the company became such that, on the 31st of January, 1894, there was executed by complainant Breyfogle, to the order of himself, two notes, one for $300,000, and the other for $166,667.95, each bearing interest at 6 per cent., to secure which there was, by the express terms of the writing attached to the notes, transferred and delivered to the legal holders thereof $400,000, par value, of the bonds of the Bedford Stone Quarries Company, and certain other collateral, therein named, which notes were, on the same day, indorsed in blank by Breyfogle. It is undisputed that the Jennings Trust Company eventually ad-

vanced the money represented by these notes, and thereafter held them as evidence of the indebtedness, though it is claimed by the complainants that Walsh, under his agreement with them, was obliged to personally attend to the payment or renewal of the same, and to prevent a sale of the collateral securities. In the meantime, the pressure of the times compelled an assignment by the companies, and, under the laws of the state of Indiana, the complainant Breyfogle was appointed trustee. It is substantially averred by the complainants that, though the companies appeared to be insolvent, the enterprise was, in fact, a paying one, and was susceptible of development into one of such great profit as to attract the cupidity of the defendant Walsh; and that thereupon, in violation of his agreement with the complainants to take care of the outstanding notes, and to advance whatever else was needed, he, in fact, in April, 1894, caused the Equitable Trust Company, successor to the Jennings Trust Company, to demand immediate payment of the notes; and that this demand was in execution of a conspiracy between Walsh and the Equitable Trust Company to compel the complainants to surrender up to Walsh, or the trust company, all their interest in the property. Whatever the motive, it appears that the complainants were unable to comply with this demand, such inability, according to their averment, being due to their reliance upon Walsh's promise to take care of these obligations. Application was made by them, according to the averments of the bill, to Walsh, to carry out his agreement, and prevent the trust company from selling the collateral mentioned in the notes, whereupon the supposed agreement was repudiated by Walsh, and the assertion made that no relations other than those of debtor and creditor had ever existed between them. In view of this demand, and of that of the trust company to sell the bonds and stock according to the power of attorney attached to the notes, the complainants, on the 8th day of June, 1894, were compelled, the bill avers, to enter into a written agreement with the holder, the Equitable Trust Company, whereby, in exchange for the surrender of the two notes of William Breyfogle, before mentioned, and the agreement to pay a balance upon another contract of $65,000, the complainants, by express agreement, assigned and set over to the Equitable Trust Company the bonds, stock, and notes now in dispute. This agreement was accompanied by another, releasing John R. Walsh from all claims and demands of Breyfogle, and especially from all claims against him as partner with said Breyfogle or his associates; and by still another, evidencing the agreement of the Equitable Trust Company, in consideration of the sum of one dollar in hand paid, to sell and deliver to Breyfogle the bonds, stocks, and notes in question, upon the payment by him, before the 1st of November, 1894, of the sum of $542,720.95, with interest thereon at the rate of 6 per cent., and such additional sum as might be expended, after the date of the agreement, in paying the outstanding indebtedness of the companies, or protecting their title, in excess of the net receipts from the operation of the properties. As an inducement to the making of these contracts, the

complainants aver the defendant Walsh promised to aid complainants in finding a purchaser of the properties prior to the 1st of November, and especially, in view of such negotiation, to keep secret the existence of these contracts. But, it is averred, in execution of the conspiracy, Walsh published the facts of the transaction, and thereby prevented the complainants from consummating any deal looking to the redemption of the property. It appears that, while the management of the property has remained with its previous officers, their resignations were placed in the hands of the defendants, and the object of this bill is to enjoin the defendants from accepting these resignations, or ousting the present officers from the management of the property, and from disposing of the stocks and securities that came into their hands under the agreement of June, 1894, or from disturbing generally the status of the parties.

It appears plain to me that, before the prayer of the bill can be granted, I must hold, in favor of the complainants, the following propositions: (1) That Walsh entered into the alleged agreement whereby he, in effect, became a partner of the complainants in the venture, obligating himself to obtain the necessary money advances, and especially to take care of the indebtedness arising from the advancements of the Jennings Trust Company upon the Breyfogle notes. (2) That Walsh conceived and put in execution the design of capturing the entire property of the companies, and for this purpose, disregarding his obligations above stated, used his power, as president of the trust company, to bring on the demand for payment of the notes, and thus took advantage of the confidence and financial unreadiness of the complainants, whereby they were oppressed into the agreements of June, 1894. (3) That, notwithstanding the agreements of June, 1894, are expressed in plain and unequivocal terms, it is competent by proof aliunde, and resting entirely in parol, to ascertain and give effect to another agreement wholly at variance with and nugatory of the written agreements. And, (4) assuming the three foregoing propositions in favor of the complainants, the complainants are in a situation where, justly and equitably, they can ask that the trust company be subjected to the restraints prayed for in the bill.

The view I have taken of the last proposition makes it unnecessary to consider the preceding ones. This is not a bill to redeem. The complainants make no offer to pay off the indebtedness due the Equitable Trust Company, and, indeed, show themselves wholly unable to meet those obligations. The setting aside of the agreements of June, 1894, would, alone, avail complainants but little. The trust company, as holder of the notes, aggregating over $566,000, with the bonds and stocks as collateral thereto, would be in a legal position to press again for immediate payment, and, upon failure thereof, to sell the pledged securities. The complainants virtually confess that, in such event, they would be compelled again to default, and suffer the collateral to go to sale. It is clear, from past experience and the virtual admissions of the parties, that such a sale would not realize an amount in excess of the debt. I do not foresee, then, how the hand of the chancellor could relieve the complainants' situation, unless it reached further than the mere annulment of the agreements of June, 1894, and

arrested the trust company in any attempt to collect the notes, either until Walsh had complied with his supposed agreements, or the complainants had been accorded an opportunity to put the properties upon the market and work up and negotiate their sale. In other words, I am called upon either to cancel these notes as evidences of indebtedness to the trust company, or, if no case for that exists, to restrain the creditor from their collection until the debtor can make the amounts out of the property. It may be assumed that Walsh entered into the engagements alleged, and, as president of the bank and trust company, possessed unlimited influence and control in the management of their affairs. But it does not follow that the power thus actually possessed, as between him and these institutions, is lawful power. The bank and the trust company are not mere private corporations. Their funds are not the aggregation of the private wealth of Walsh and his associates. Their financial condition is not the interest solely of the president and directors. They are, in an important sense, public institutions. The funds loaned by them are the gatherings from innumerable sources, and the officers are, in that important sense, only the trustees of the great public, which makes its deposits in the confidence that the institutions are managed along the lines of the law and of honest and sound financial considerations. The law itself interposes, by means of compulsory reports and inspections, to assure itself, from time to time, that these considerations are not violated. The president of one of these institutions who would part with its funds upon the strength of apparent notes with collateral security, but under a private arrangement by which such notes and securities could not be used according to their legal import and possibilities, would be a criminal against his trust. What right has he, for private gain, to hazard these securities, or impose restraints upon those to whom the fund really and beneficially belongs? What will become of the public confidence if, by private understanding, the assets are really different from what the books and files of the institution disclose? How can the government maintain supervision, if the writings that come under its inspection are not expressive of the real relations between the institution and its borrowers? Situations often arise where one of two innocent persons must suffer from the wrongs of a third, and where the courts, through compulsion, are obliged to impose a hardship upon one to save a loss to the other. The maxim decisive of such cases is that the loss must fall upon the one who comes the nearer to responsibility for the wrong of the offender. Thus, cases may arise where, in their dealings with third persons, even banks and trust companies may be subjected to losses that are clearly the result of the unauthorized conduct of their officers. Is the case presented to the court now of such a character? The complainants unquestionably knew, or had reason to believe, that the notes would be discounted at the bank or the trust company. If Walsh was a partner in the venture, either secretly or openly, and had, as such, engaged to take care of these notes, the complainants, as reasonable men, must have understood that he could not follow this engagement to the prejudice of these institutions. They had no right, knowing this, to deal with him beyond his lawful power, or to obtain money

from these institutions upon an arrangement that would have been at once violative of law, honor, and safe business methods. If Walsh entered into the arrangement alleged, he did a gross wrong to the public, and to the debtors of the trust company, and the complainants, confessedly, have shared in the knowledge of this wrong. It is not an answer to say that they supposed that, out of his great wealth, he could meet the necessities of his obligations without trenching upon the rights of the trust company. They could take that risk, if they saw fit, but, if it fails, cannot throw upon the trust company or the bank the resultant consequences. It is beyond conscientious conception that the great funds deposited in our banking and trust institutions are at the mercy of such arrangements as grasping officials and ambitious adventurers may enter upon. But such would be the real facts if courts, in cases like this, could cancel the supposed assets of these institutions, or arrest their collection, or in any way interfere with the plain legal effect that their face imports. If the complainants have been deceived, and thereby suffer loss, it is because they have embarked their interests upon a chance that the defendant Walsh had no lawful right, as against the trust company or the bank, to hold out. Their rights, whatever they are, remain against Walsh as an individual, and cannot be carried over against the trust company. I can find no way, as between them and the trust company, to give them any substantial relief. It is only just that I should add that the question of the truth of the charges against defendant Walsh has not been considered. Had I entered into that branch of the case, I would have called for affidavits to meet the complainants' case, or have referred the case to a master to direct an inquiry. The case, as disposed of, is upon the assumption of the correctness of the complainants' averments of fact, and not upon proof thereof. Accordingly, the motion for injunction will be overruled, and the present restraining order dissolved.